IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SYNERGICS ENERGY SERVICES,
LLC,

*Plaintiff*,

v.                                                            Civil Action No. ELH-13-2257

ALGONQUIN POWER FUND
(AMERICA), INC., et al.,

*Defendants*.

### MEMORANDUM OPINION

Synergics Energy Services, LLC ("Synergics"), plaintiff, filed suit against defendants

Algonquin Power Fund (America), Inc. ("Algonquin"), and Eagle Creek Renewable Energy,

LLC ("Eagle Creek").[1]  Suit arises from Synergics's sale to Algonquin in 2000 of a hydroelectric

power plant located in New Jersey, and Algonquin's transfer of that plant to Eagle Creek in

2000.[2]  In the Complaint, Synergics asserts three contract claims against Algonquin (Counts I

through III).   In Count IV, Synergics seeks a declaration as to its rights and Algonquin's

obligations pursuant to two contracts dating from 2000.  *See* Complaint ¶ 32.  Synergics's sole

claim concerning Eagle Creek, which is contained in Count IV, is Synergics's request that the

Court establish "a trust in favor of Synergics" and require Eagle Creek "to place all cash flow

and revenue" earned from the hydroelectric power plant into the trust.  *See id.* ¶ 33; *see also id.*

¶ 40.

---

[1] Jurisdiction is premised on diversity of citizenship.  *See* Complaint ¶ 4; 28 U.S.C.
§ 1332.  However, as discussed, *infra*, diversity jurisdiction has not been established.

[2] In December 2007, all assets and obligations of Synergics Energy Development, Inc.
and Great Falls Investors, LLC were assigned to Synergics, including the hydroelectric power
plant.  In the parties' submissions, they regard Synergics as the seller in 2000.  For simplicity, I
typically will not distinguish between Synergics and its predecessors in interest, except where the
distinction has some independent significance.

Now pending is Eagle Creek's motion to dismiss, based upon a lack of personal jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(2), and for failure to state a claim upon which relief may be granted, pursuant to Fed. R. Civ. P. 12(b)(6).  *See* ECF 11 ("Motion to Dismiss") and ECF 11-1 (the supporting memorandum, "Mem."); ECF 32 ("Reply Memorandum in Support of Defendant Eagle Creek's Motion to Dismiss"); ECF 37 ("Supplemental Brief in Support of Defendant Eagle Creek's Motion to Dismiss") (the "Supplemental Memorandum" or "Supp. Mem.").  Eagle Creek's Motion to Dismiss is supported by the Declaration of Bernard Cherry, the company's chief executive officer ("CEO"), dated September 19, 2013.  *See* ECF 11-2 ("Cherry Decl.").  Plaintiff opposes the Motion to Dismiss.  *See* ECF 27 ("Plaintiff's Response in Opposition to Eagle Creek Renewable Energy LLC's Motion to Dismiss") and ECF 28 (the supporting memorandum, "Opp."); ECF 38 ("Plaintiff's Supplemental Response in Opposition to Eagle Creek Renewable Energy LLC's Motion to Dismiss") (the "Supplemental Opposition" or "Supp. Opp.").  In ECF 38, plaintiff has also moved to strike an exhibit attached to Eagle Creek's Supplemental Memorandum (the "Motion to Strike").  Eagle Creek filed an opposition (ECF 39), and Synergics replied (ECF 40).

Also pending is Algonquin's motion to dismiss Synergics's claim for attorneys' fees (ECF 14), to which it has attached a supporting memorandum (ECF 14-1).  Synergics opposes Algonquin's motion (ECF 22, 23), and Algonquin replied (ECF 29).[3]

No hearing is necessary to resolve the motions.  *See* Local Rule 105.6.  For the reasons that follow, I will grant Eagle Creek's motion to dismiss for lack of personal jurisdiction.  I will

---

[3] Algonquin also filed an Answer (ECF 13) on September 25, 2013.  With the exception of its motion regarding Synergics's request for attorneys' fees, Algonquin has not sought dismissal of Synergics's claims.  Additionally, Algonquin filed a one-count counterclaim, seeking declaratory judgment.  *See* ECF 13 at 10-16.  Synergics subsequently answered Algonquin's counterclaim (ECF 24).

deny, as moot, both Eagle Creek's motion to dismiss under Rule 12(b)(6) and Synergics's Motion to Strike.  And, I will deny Algonquin's motion to dismiss the claim for attorneys' fees.

## I. Background

In September 2000, Synergics Energy Development, Inc. and Great Falls Investors, LLC entered into a Purchase and Sale Agreement with Algonquin (the "2000 Purchase Agreement," attached to the Complaint as Exhibit A, ECF 1-2).[4]  Pursuant to its terms, Algonquin agreed to purchase the general and limited partnership interests in the Great Falls Hydroelectric Company Limited Partnership (the "Great Falls Project Company"), which owns a hydroelectric power plant located on the Passaic River in Paterson, New Jersey (the "Hydroelectric Plant").  Compl. ¶ 6.  Pursuant to the 2000 Purchase Agreement, Algonquin was required to pay, in addition to a lump sum due at closing, monthly royalties to Synergics.  *Id.* ¶ 7.  The royalty obligation was set forth in a separate agreement (the "Royalty Agreement," attached to the Complaint as Exhibit B). In 2007, the obligations and assets of Synergics Energy Development, Inc. and Great Falls Investors, LLC were assigned to plaintiff, Synergics Energy Services, LLC.  Compl. ¶ 8.

The 2000 Purchase Agreement sets forth several avenues by which Algonquin is permitted to transfer its interests in the Hydroelectric Plant.  *See* 2000 Purchase Agreement, Art. VII, § 7.10.  Of relevance here, Art. III, § 3.2(c) of the 2000 Purchase Agreement provides: "In the event [Algonquin] sells, transfers or assigns the Hydroelectric Plant or the Interests or otherwise disposes of any of its rights under [the 2000 Purchase Agreement], it shall pay to Synergics a lump sum payment," to be calculated as specified therein (the "Transfer Payment"). *See* Compl. ¶ 9.

---

[4] The 2000 Purchase Agreement is attached to the Complaint, is integral to its allegations, and no party disputes its authenticity.  Accordingly, I may consider it under a Rule 12(b)(6) standard.  *See Anand v. Ocwen Loan Servicing, LLC*, --- F.3d ----, 2014 WL 2535405, at *2 (4th Cir. June 6, 2014) (citing *Philips v. Pitt County Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)).  The same is true of the Royalty Agreement, discussed *infra*.

In general, Algonquin must obtain written consent from Synergics to transfer its interest

in the Hydroelectric Plant.  *See* Art. VII, § 7.10; Compl. ¶ 15.  However, Synergics's consent is

not required where Algonquin either (a) assigns its obligations and liabilities under the 2000

Purchase Agreement and certain conditions are met, or (b) makes a Transfer Payment to

Synergics.   Compl. ¶ 15.   Specifically, Art. VII, § 7.10 of the 2000 Purchase Agreement

provides:

> [Algonquin] shall not directly or indirectly . . . transfer, sell, assign or
> otherwise dispose of all or a portion of the Interests,[5] its interests in [the]
> Hydroelectric Plant, or a controlling interest in the [Great Falls Project Company]
> or [Algonquin], without Synergics's prior written consent; provided that such
> consent shall not be required if (A)(i) such assignment, transfer or other
> transaction is with a creditworthy entity that, in Synergics' reasonable opinion,
> has the financial and technical capability to perform hereunder, and (ii)
> [Algonquin] delivers an assignment and assumption of the obligations and
> liabilities under this Agreement and the Royalty Agreement, duly executed by
> such entity, in form and substance reasonably satisfactory to Synergics; or (B)
> [Algonquin] makes the Transfer Payment.

Art. X, § 10.6 of the 2000 Purchase Agreement contains a provision titled "Governing

Law."  It states:

> This Agreement shall be governed by and construed in accordance with
> the laws of the State of Maryland, U.S.A., as to all matters, including but not
> limited to matters of validity, construction, effect, performance and remedies.
> Any and all disputes arising out of or in connection with this Agreement shall be
> adjudicated in the federal or state courts located in the State of Maryland, U.S.A.
> to whose jurisdiction the parties hereby irrevocably submit for such purposes.

In the Complaint, Synergics asserts: "Algonquin's failure to obtain Synergics' written

consent prior to transferring its interest in the Hydroelectric Plant, or in the alternative, assigning

its obligations and liabilities to Eagle Creek under the [2000] Purchase Agreement and the

---

[5] The 2000 Purchase Agreement defines "Interests" to include both (1) the membership
interests in Great Falls Energy owned by Synergics and (2) the interests in the Great Falls Project
Company owned by Great Falls Investors, LLC.  *Id.* at 1 ("Recitals").

Royalty Agreement or making a transfer payment to Synergics, constitutes a breach of the [2000] Purchase Agreement, causing Synergics to suffer damages." Compl. ¶ 17.

Synergics also maintains that Algonquin must "obtain approval of Synergics prior to any negotiations or discussions related to its Interests in the Hydroelectric Plant and any transactions that may be contemplated." Compl. ¶ 18. As Synergics notes, *id.*, the 2000 Purchase Agreement states, in a subsection titled "Public Statements":

> The Seller and the Buyer agree that they will consult with each other in advance of making any public announcement or press release, or otherwise disclosing any information, relating to the execution of [the 2000 Purchase Agreement] or any transactions contemplated hereby, or otherwise relating to the Interests, the [Great Falls Project Company], or the Hydroelectric Plant and will negotiate in good faith with respect to the form, content and timing thereof and shall not issue any such release without the prior approval of the other party . . . .

2000 Purchase Agreement, Art. VII, § 7.5.

In June 2013, Eagle Creek entered into an agreement with Algonquin under which Eagle Creek purchased all of the membership interests of the Great Falls Project Company, a limited partnership organized under the laws of Maryland that owns the Hydroelectric Plant in Paterson, New Jersey. The two members of the Great Falls Project Company are Eagle Creek Northeast I, LLC ("Eagle Creek Northeast") and Great Falls Energy, LLC ("Great Falls Energy"). Eagle Creek Northeast, a Delaware limited liability company, is the sole limited partner of the Great Falls Project Company and owns a 98% limited partnership interest. Great Falls Energy, a Maryland limited liability company, is the sole general partner of the Great Falls Project Company, and owns a 2% general partnership interest. Cherry Decl. ¶¶ 15-17.

Although Great Falls Energy and Eagle Creek Northeast are both members of the Great Falls Project Company, Great Falls Energy is itself wholly owned by Eagle Creek Northeast. In turn, Eagle Creek Northeast is wholly owned by defendant Eagle Creek. *Id.* In other words,

Eagle Creek's ownership of the two Maryland entities arises from its ownership of Eagle Creek Northeast.

According to Synergics, the June 2013 transaction between Algonquin and Eagle Creek qualified as a "transfer," as defined in the 2000 Purchase Agreement. Compl. ¶ 10. Shortly after the transaction, on or about July 8, 2013, Synergics received a copy of a letter from Algonquin indicating that Algonquin had sold its interests to Eagle Creek. *Id.* ¶ 19; *see id.* Exh. C (ECF 1-4, letter dated July 8, 2013). Synergics claims that Algonquin did not obtain Synergics's approval prior to its discussions and negotiations with Eagle Creek, as required under the 2000 Purchase Agreement. Compl. ¶ 20. Further, Synergics claims that a Transfer Payment became due at that time. *Id*. ¶ 10. Indeed, Synergics demanded that Algonquin make a Transfer Payment, pursuant to the 2000 Purchase Agreement and Royalty Agreement, but Algonquin has not done so. *Id.* ¶¶ 11-12.

Subsequently, on August 2, 2013, Synergics filed suit against Algonquin and Eagle Creek. ECF 1 (Complaint). As indicated, Synergics brings three breach of contract claims against Algonquin (Counts I through III), while also seeking a declaration as to its rights and Algonquin's obligations pursuant to the 2000 Purchase Agreement and Royalty Agreement (Count IV). The only claim raised against Eagle Creek is found in Count IV, in which Synergics "requests that this Court grant it injunctive relief by establishing a trust in favor of Synergics" and by requiring Eagle Creek "to place all cash flow and revenue" earned from the Hydroelectric Plant into the trust. *See id.* ¶ 33; *see also id.* ¶ 40. Synergics notes that the Royalty Agreement requires the establishment of a trust in its favor, adding that Algonquin had failed to establish a trust. *Id.* ¶ 39 (citing Royalty Agreement § 3).

In a Memorandum to Counsel dated August 6, 2013 (ECF 3), the Court noted that, upon reviewing the Complaint, it was not apparent that diversity jurisdiction existed. *Id.* at 1. Specifically, the Complaint failed to establish the citizenship of any of the three parties for purposes of diversity jurisdiction. *Id.* In letters to the Court dated August 9, 2013 (ECF 7), and August 13, 2013 (ECF 9), plaintiff's counsel supplied information that clarified the citizenship of Synergics and Algonquin. But, questions remained as to the citizenship of Eagle Creek. *See* ECF 8 (Memorandum to Counsel dated August 9, 2013); ECF 16 (Memorandum to Counsel dated September 30, 2013).

As the Court observed in its correspondence to the parties, *see* ECF 8, 16, for purposes of diversity jurisdiction, the citizenship of a limited liability company—such as Eagle Creek—"is determined by the citizenship of all of its members." *Cent. W. Va. Energy Co. v. Mountain State Carbon, LLC*, 636 F.3d 101, 103 (4th Cir. 2011). Of relevance here, the members' citizenship "must be traced through however many layers of partners or members there may be." *Hart v. Terminex Int'l*, 336 F.3d 541, 543 (7th Cir. 2003). *See Forrest v. Green Tree Servicing, LLC*, 2013 WL 3270447, at *4 (D. Md. June 25, 2013) ("[T]his jurisdictional issue has the potential to be iterative. If even one of [the] members is another unincorporated entity, the citizenship of each of that member's members (or partners, as the case may be) must then be considered.") (citation omitted). In a letter to the Court dated October 21, 2013 (ECF 25), counsel for Eagle Creek averred that, due to assertions of confidentiality by its members, and by those members' own members and partners, Eagle Creek was unable to ascertain the requested information in its entirety.

Synergics filed a motion seeking leave to conduct jurisdictional discovery (ECF 30). The Court then held a telephonic conference with the parties on December 5, 2013. As memorialized

in a letter to counsel dated December 5, 2013 (ECF 36), the Court determined that it was prudent to first address Eagle Creek's motion to dismiss based on lack of personal jurisdiction.   The Court also granted plaintiff leave to proceed with limited jurisdictional discovery, by way of a two-hour deposition of a corporate designee of Eagle Creek, pursuant to Fed. R. Civ. P. 30(b)(6). *Id*.   Plaintiff subsequently deposed Bernard Cherry, who has been Eagle Creek's CEO since late 2010.   Deposition of Bernard H. Cherry, Jan. 15, 2014 (ECF 37-1, "Cherry Dep.") at 7.

Additional facts are included in the Discussion.

## II.  Legal Standards

### A.  Fed. R. Civ. P. 12(b)(2) Standard

Eagle Creek's motion to dismiss for lack of personal jurisdiction is predicated on Fed. R. Civ. P. 12(b)(2).  "When a court's personal jurisdiction is properly challenged by a Rule 12(b)(2) motion, the jurisdictional question thus raised is one for the judge, with the burden on the plaintiff ultimately to prove the existence of a ground for jurisdiction by a preponderance of the evidence."  *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989).   Discovery and an evidentiary hearing are not required to resolve a motion under Rule 12(b)(2).   *See generally* 5B Wright & Miller, Federal Practice & Procedure § 1351, at 274-313 (3d ed. 2004, 2012 Supp.) ("Wright & Miller").   Rather, a district court may address the question of personal jurisdiction as a preliminary matter, ruling solely on the basis of motion papers, supporting legal memoranda, affidavits, and the allegations in the complaint.  *Consulting Engineers Corp. v. Geometric Ltd.*, 561 F.3d 273, 276 (4th Cir. 2009).   In that circumstance, the plaintiff need only make "a prima facie showing of a sufficient jurisdictional basis to survive the jurisdictional challenge."   *Id.*

"In deciding whether the plaintiff has made the requisite showing, the court must take all disputed facts and reasonable inferences in favor of the plaintiff."   *Carefirst of Maryland, Inc. v.*

*Carefirst Pregnancy Centers, Inc.*, 334 F.3d 390, 396 (4th Cir. 2003).  However, "district courts are not required to look solely to the plaintiff's proof in drawing those inferences."  *Mylan Laboratories, Inc. v. Akzo, N.V.*, 2 F.3d 56, 62 (4th Cir. 1993).  In any event, "'[a] threshold *prima facie* finding that personal jurisdiction is proper does not finally settle the issue; plaintiff must eventually prove the existence of personal jurisdiction by a preponderance of the evidence, either at trial or at a pretrial evidentiary hearing.'"  *New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*, 416 F.3d 290, 294 n.5 (4th Cir. 2005) (citation omitted).

A court may also, in its discretion, permit discovery as to the jurisdictional issue.  *See Mylan Laboratories*, 2 F.3d at 64.  "If the existence of jurisdiction turns on disputed factual questions the court may resolve the [jurisdictional] challenge on the basis of a separate evidentiary hearing, or may defer ruling pending receipt at trial of evidence relevant to the jurisdictional question."  *Combs*, 886 F.2d at 676.  However, under a Rule 12(b)(2) standard, a hearing is unnecessary to resolve a motion to dismiss for lack of personal jurisdiction.  *See* Wright & Miller, § 1351, at 274-313; *see also* Local Rule 105.6.  Rather, "if the Court decides to rule on the basis of the complaint, affidavits, and discovery materials, without conducting an evidentiary hearing, 'the plaintiff need only make a *prima facie* showing of personal jurisdiction,' and the court is to 'take all disputed facts and reasonable inferences in favor of the plaintiff.'"  *Rist v. Xcentric Ventures, LLC*, 2013 WL 2946762, at *1 (D. Md. June 12, 2013) (quoting *Carefirst of Maryland*, 334 F.3d at 396).

**B.  Fed. R. Civ. P. 12(b)(6) Standard**

A motion to dismiss pursuant to Rule 12(b)(6) constitutes an assertion by a defendant that, even if the facts alleged by the plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."  Whether a complaint states a claim for relief is

assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2).  It provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  The purpose of the rule is to provide the defendant with "fair notice" of the claim and the "grounds" for entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 n.3 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

A plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555.  But, the rule demands more than bald accusations or mere speculation.  *Id.*; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013).  To satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely."  *Twombly*, 550 U.S. at 556.  In other words, the complaint must contain facts sufficient to "state a claim to relief that is plausible on its face."  *Id.* at 570; *see Iqbal*, 556 U.S. at 684; *Simmons v. United Mortg. and Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011).

In reviewing such a motion, a court "'must accept as true all of the factual allegations contained in the complaint,'" and must "'draw all reasonable inferences [from those facts] in favor of the plaintiff.'"  *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir.), *cert. denied*, ____ U.S. ____, 132 S. Ct. 402 (2011); *Monroe v. City of Charlottesville*, 579 F.3d 380, 385-86 (4th Cir. 2009), *cert. denied*, 559 U.S. 991 (2010).  However, a complaint that provides no more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action," is insufficient.  *Twombly*, 550 U.S. at 555.  Moreover, the court is not required to accept

legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Monroe*, 579 F.3d at 385-86.

A Rule 12(b)(6) motion will be granted if the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679 (citation omitted). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy he or she seeks. *A Society Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011), *cert. denied*, ___ U.S. ___, 132 S. Ct. 1960 (2012). "'Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory.'" *Hartmann v. Calif. Dept. of Corr. & Rehab.*, 707 F.3d 1114, 1122 (9th Cir. 2013) (citation omitted); *accord Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Reg. Sys., Inc.*, 680 F.3d 1194, 1201-02 (10th Cir. 2011) ("When reviewing a 12(b)(6) dismissal, 'we must determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed.' Dismissal is appropriate if the law simply affords no relief.") (citation omitted).

A motion asserting failure to state a claim typically "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses," *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999) (internal quotation marks omitted), unless such a defense can be resolved on the basis of the facts alleged in the complaint. *See Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007). "This principle only applies, however, if all facts necessary to the affirmative defense '*clearly appear*[ ] *on the face of the complaint*,'" or in other documents that are proper subjects of consideration under Rule 12(b)(6). *Id.* (quoting

*Richmond, Fredericksburg & Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993)) (emphasis in *Goodman*).

In evaluating the sufficiency of a complaint in connection with a Rule 12(b)(6) motion, a court ordinarily "may not consider any documents that are outside of the complaint, or not expressly incorporated therein . . . ." *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013). In considering a challenge to the adequacy of the Complaint, however, the court "may properly consider documents attached to a complaint or motion to dismiss 'so long as they are integral to the complaint and authentic.'" *Anand v. Ocwen Loan Servicing, LLC*, --- F.3d ----, 2014 WL 2535405, at *2 (4th Cir. June 6, 2014) (quoting *Philips v. Pitt County Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)); *see also E.I. du Pont de Nemours & Co.*, 637 F.3d at 448. To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis in original).

### III. Discussion

### A. Eagle Creek's motion to dismiss for lack of personal jurisdiction

Fed. R. Civ. P. 4(k)(1)(A) authorizes a federal district court to exercise personal jurisdiction over a defendant in accordance with the law of the state in which the district court is located. *Carefirst of Maryland*, 334 F.3d at 396. Therefore, "to assert personal jurisdiction over a nonresident defendant, two conditions must be satisfied: (1) the exercise of jurisdiction must be authorized under the state's long-arm statute; and (2) the exercise of jurisdiction must comport with the due process requirements of the Fourteenth Amendment." *Id.*

Maryland's long-arm statute is codified at Md. Code (2013 Repl. Vol.), § 6-103(b) of the Courts & Judicial Proceedings Article ("C.J."). It authorizes "personal jurisdiction over a person, who directly or by an agent":

> (1) Transacts any business or performs any character of work or service in the State;
> (2) Contracts to supply goods, food, services, or manufactured products in the State;
> (3) Causes tortious injury in the State by an act or omission in the State;
> (4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State;
> (5) Has an interest in, uses, or possesses real property in the State; or
> (6) Contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation, or agreement located, executed, or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing.

*Id*.

Maryland's courts have "consistently held that the purview of [Maryland's] long arm statute is coextensive with the limits of personal jurisdiction set by the due process clause of the Federal Constitution." *Beyond Systems, Inc. v. Realtime Gaming Holding Co.*, 388 Md. 1, 15, 878 A.2d 567, 576 (2005) (citing *Mohamed v. Michael*, 279 Md. 653, 657, 370 A.2d 551, 553 (1977)). "Because the limits of Maryland's statutory authorization for the exercise of personal jurisdiction are coterminous with the limits of the Due Process Clause, the statutory inquiry necessarily merges with the constitutional inquiry, and the two inquiries essentially become one." *Stover v. O'Connell Assocs., Inc.*, 84 F.3d 132, 135-36 (4th Cir. 1996); *accord ALS Scan, Inc. v. Digital Service Consultants, Inc.*, 293 F.3d 707, 710 (4th Cir. 2002). However, "the long-arm statute must still be examined as part of the two-step personal jurisdiction analysis." *Haley Paint Co. v. E.I. Dupont De Nemours & Co*., 775 F. Supp. 2d 790, 796 (D. Md. 2011)

- 13 -

(Bennett, J.) (citing *Mackey v. Compass Mktg., Inc.*, 391 Md. 117, 141 n.6, 892 A.2d 479, 493 n.6 (2006)).

The United States Supreme Court has long held that personal jurisdiction over a nonresident defendant is constitutionally permissible so long as the defendant has "minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Due process jurisprudence recognizes "two types of personal jurisdiction: general and specific." *CFA Institute v. Institute of Chartered Financial Analysts of India*, 551 F.3d 285, 292 n.15 (4th Cir. 2009). The difference between the two turns on the nature and extent of the contacts with the forum state that are necessary to meet the "minimum contacts" threshold. The Fourth Circuit has explained:

> General personal jurisdiction, on the one hand, requires "continuous and systematic" contacts with the forum state, such that a defendant may be sued in that state for any reason, regardless of where the relevant conduct occurred. Specific personal jurisdiction, on the other hand, requires only that the relevant conduct have such a connection with the forum state that it is fair for the defendant to defend itself in that state.

*Id.* (citing, *inter alia*, *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-15 (1984)) (internal citations omitted); *see also Goodyear Dunlop Tires Operations, S.A. v. Brown*, ___ U.S. ___, 131 S. Ct. 2846, 2851 (2011) ("*Goodyear*") (explaining that a court may exercise general jurisdiction to hear "any and all claims" against a corporation "when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State," whereas specific jurisdiction "depends on an 'affiliatio[n] between the forum and the underlying controversy'" (citations omitted) (alteration in original)).

To determine whether the due process requirements for asserting specific jurisdiction have been met, a court considers: "(1) the extent to which the defendant has purposefully availed

itself of the privilege of conducting activities in the state; (2) whether the plaintiffs' claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'" *Consulting Engineers*, 561 F.3d at 278 (citing *ALS Scan*, 293 F.3d at 715); *see also Carefirst of Maryland*, 334 F.3d at 397.

"The first prong articulates the minimum contacts requirement of constitutional due process that the defendant purposefully avail himself of the privilege of conducting business under the laws of the forum state." *Consulting Engineers*, 561 F.3d at 278. "Th[e] 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or a third person.'" *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 (1985) (internal citations omitted); *see also ESAB Grp., Inc. v. Zurich Ins. PLC*, 685 F.3d 376, 392 (4th Cir. 2012). To satisfy the second prong of the test for specific jurisdiction, the defendant's contacts with the forum state must form the basis of the suit. *Consulting Engineers*, 561 F.3d at 278-79. The constitutional reasonableness inquiry permits a defendant "who purposefully has directed his activities at forum residents" to defeat jurisdiction, if he can "present a compelling case that the presence of some other considerations would render jurisdiction unconstitutional." *Burger King*, 471 U.S. at 477. "This prong of the analysis ensures that litigation is not so gravely difficult and inconvenient as to place the defendant at a severe disadvantage in comparison to his opponent." *Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co., Ltd.*, 682 F.3d 292, 303 (4th Cir. 2012) (citing *CFA Inst.*, 551 F.3d at 296) (internal quotation marks omitted), *cert. denied*, ____ U.S. ____, 133 S. Ct. 846 (2013).

In contrast, "the threshold level of minimum contacts sufficient to confer general jurisdiction is significantly higher than for specific jurisdiction." *ALS Scan*, 293 F.3d at 715

(internal quotation marks omitted); *accord Saudi v. Northrop Grumman Corp.*, 427 F.3d 271, 276 (4th Cir. 2005).   The Fourth Circuit has long held that "broad constructions of general jurisdiction" are "generally disfavored."   *Nichols v. G.D. Searle & Co.*, 991 F.2d 1195, 1200 (4th Cir. 1993).   Recently, in *Daimler AG v. Bauman*, ____ U.S. ____, 134 S. Ct. 746, 760 (2014), the Supreme Court made clear that "only a limited set of affiliations with a forum will render a defendant amenable to all-purpose jurisdiction there."   In particular: "[T]he inquiry under *Goodyear* is not whether a foreign corporation's in-forum contacts can be said to be in some sense 'continuous and systematic,' it is whether that corporation's 'affiliations with the State are so "continuous and systematic" as to render [it] essentially at home in the forum State.'"   *Id.* at 761 (quoting *Goodyear*, 131 S. Ct. at 2851) (alteration in original).[6]

In this case, there are two primary sources of information regarding this Court's exercise of jurisdiction over Eagle Creek: the declaration and the deposition of Bernard Cherry, Eagle Creek's CEO.   As noted, under a Fed. R. Civ. P. 12(b)(2) standard, a court is not limited to the allegations in the complaint.   Instead, a court may consider materials such as affidavits.   *See Consulting Engineers*, 561 F.3d at 276.   Although "the court must take all disputed facts and reasonable inferences in favor of the plaintiff," *Carefirst of Maryland*, 334 F.3d at 396, the court is "not required to look solely to the plaintiff's proof in drawing those inferences."   *Mylan Laboratories*, 2 F.3d at 62.

Eagle Creek is a Delaware limited liability company with its principal place of business at 65 Madison Avenue, Suite 500, Morristown, New Jersey 07960.   Cherry Decl. ¶ 3.   Founded in 2010, Eagle Creek is engaged in the business of owning, operating, and developing small-scale hydroelectric power projects.   Cherry Decl. ¶ 3.   It owns and operates hydroelectric

---

[6] In *Goodyear*, 131 S. Ct. at 2851, the Supreme Court indicated that the discussion of "foreign" corporations pertains to both "sister-state" and "foreign-country" entities.

facilities in Illinois, Wisconsin, Michigan, Minnesota, New York, New Jersey, and New Hampshire.  Eagle Creek does not own any facilities in Maryland.  *Id.* ¶¶ 3-5.

The members of Eagle Creek are Hudson Eagle Creek RE Holdings, LLC; Power Energy Eagle Creek, LLC; HESTA Clean Technology Trust; and Macquarie Clean Technology Fund II, L.P.  To the best of Mr. Cherry's knowledge, the members of Eagle Creek are not Maryland entities and do not conduct any business in Maryland.  Cherry Decl. ¶ 4.

Eagle Creek does not maintain a business presence of any kind in Maryland.  Cherry Decl. ¶ 7.  None of the approximately 100 individuals employed by Eagle Creek-owned entities are located in Maryland.  *See id.* ¶ 6; Cherry Dep. at 59, 65.[7]  It does not own real estate in Maryland, nor does it have any offices, warehouses, or other business locations in Maryland.  Cherry Decl. ¶ 8.  Eagle Creek is not registered to do business in Maryland and has no registered agent for service of process in Maryland.  *Id.* ¶ 7.  It also does not purchase materials or supplies from Maryland vendors.  *Id.* ¶ 13.  Eagle Creek has no bank account in Maryland, pays no Maryland taxes, and maintains no company records in Maryland.  *Id.* ¶ 9.  Nor has Eagle Creek ever brought a lawsuit or previously been sued in Maryland.  *Id.* ¶ 14.

Further, Eagle Creek does not advertise products or services in Maryland via mail or print publication.  Cherry Decl. ¶ 12.  Although it maintains a publicly-accessible website, the website is informational and does not offer products or services for sale.  *Id.* ¶ 11.

Eagle Creek owns approximately 40 hydroelectric companies, all of which it wholly owns, and which in turn own a larger number of hydroelectric facilities.  Cherry Dep. at 18, 49.

---

[7] At his deposition, Cherry made clear that the total figure of more than 100 employees includes employees of all of Eagle Creek's companies, and not employees of only Eagle Creek itself.  Cherry Dep. at 59.  Only two such companies—Eagle Creek RE Management and North American Hydro Operations—have employees; Eagle Creek has no employees, but does have approximately six officers, including Mr. Cherry.  *Id.* at 60.  In addition to his role at Eagle Creek, Mr. Cherry also serves as the CEO of Eagle Creek RE Management.  *Id.* at 22.

According to Eagle Creek, its sole contact with Maryland is its indirect ownership of two Maryland entities that it purchased from Algonquin: the Great Falls Project Company and Great Falls Energy.  Among the approximately 40 entities owned by Eagle Creek, only the Great Falls Project Company and Great Falls Energy were formed, or are registered to do business, in Maryland.  Cherry Dep. at 17, 50-51.

The electricity generated by Eagle Creek's hydroelectric facilities is not sold to, or consumed by, Maryland utilities or residents.  Cherry Decl. ¶ 10; *see also* Cherry Dep. at 18. The electricity generated by the Hydroelectric Plant is sold under a tariff to Public Service Electric & Gas ("PSE&G"), a regulated utility company headquartered in New Jersey.  Cherry Dep. at 23. PSE&G's tariff payments are made directly to the Great Falls Project Company.  *Id.* at 24-25.  The electricity supplied by the Hydroelectric Plant is utilized by PSE&G's customers in New Jersey, where the plant is located.  *Id.* at 26-27.

PSE&G is part of a transmission organization known as PJM, which consists of a group of utility companies serving a number of states, including Pennsylvania, New Jersey, and Maryland, and extending as far as Illinois.  Cherry Dep. at 54-55.  Although it is "[t]heoretically accurate" to say that electricity generated from a facility located at one end of the PJM grid could provide power to consumers on the other end of the grid, in practice, electricity is utilized in the load pockets closest to the point of generation.  *Id.* at 27-30, 55-56.  As a result, the electricity generated by the Hydroelectric Plant and sold to PSE&G is used by customers located near the plant in Paterson, New Jersey and does not reach Maryland.  *Id.* at 28-30.

The 2013 purchase agreement between Eagle Creek and Algonquin for the Great Falls Project Company was not negotiated in Maryland.  Cherry Decl. ¶ 19.  Moreover, it is expressly governed by New York law.  *Id.*  Disputes arising out of the agreement are subject to the

exclusive jurisdiction of the New York state and federal courts. *Id.* As a result, Mr. Cherry avers, Eagle Creek did not anticipate defending or filing a lawsuit in Maryland in connection with its purchase of the Hydroelectric Plant. *Id.*; *see also* Cherry Dep. at 45-46.

During the course of its due diligence to purchase the Great Falls Project Company, Eagle Creek became aware of the Royalty Agreement between Synergics and Algonquin. However, to Mr. Cherry's knowledge, Eagle Creek did not review the 2000 Purchase Agreement between Synergics and Algonquin. Cherry Dep. at 68-69. And, Eagle Creek was not aware of the specific terms of the 2000 Purchase Agreement regarding any obligation to make the Transfer Payment. *Id.* at 68. Mr. Cherry did not inquire as to Algonquin's intentions to make a Transfer Payment to Algonquin upon the transfer of its interests to Eagle Creek. *Id.* at 34. Nor does he believe that anyone else at Eagle Creek inquired about Algonquin's intentions concerning its existing obligations under the 2000 Purchase Agreement and Royalty Agreement with Synergics. Cherry Dep. at 35-36.

Although Eagle Creek became aware of the Royalty Agreement between Synergics and Algonquin, Eagle Creek did not assume any of Algonquin's obligations under the Royalty Agreement. Cherry Decl. ¶ 18; Cherry Dep. at 67. Nor did it assume any of Algonquin's obligations under the 2000 Purchase Agreement between Synergics and Algonquin. Cherry Decl. ¶ 18.

Contractual provisions found in two versions of the 2013 purchase agreement between Algonquin and Eagle Creek are the subject of dispute between the parties. In its Supplemental Memorandum, Eagle Creek notes that the original Algonquin-Eagle Creek purchase agreement, as drafted in March 2013, required the termination of the Royalty Agreement between Synergics and Algonquin, as a condition of the closing for the 2013 purchase agreement. Supp. Mem. at 4.

Specifically, in a letter to plaintiff's counsel dated January 23, 2014 (ECF 37-2), counsel for defendants quoted what he identified as potentially relevant provisions found in two versions of the 2013 agreement between Algonquin and Eagle Creek.  An earlier, March 2013 version of the purchase agreement stated:

> The royalty agreement between Great Falls, [Algonquin] and [Synergics] shall have been terminated pursuant to a termination in form and substance reasonably satisfactory to [Eagle Creek], and Great Falls and [Eagle Creek] shall have no Liabilities pursuant to the Great Falls Royalty Agreement from and after the Closing Date.

ECF 37-2 at 2 (quoting § 7.01(j) of the March 2013 purchase agreement).

Further, Eagle Creek notes that Algonquin and Eagle Creek executed an amended version of the purchase agreement on June 28, 2013.  Supp. Mem. at 4-5.  According to Eagle Creek, that amended agreement no longer required termination of the Royalty Agreement prior to closing, and instead required Algonquin to use "commercially reasonable efforts" to terminate the Royalty Agreement after closing.  *Id.*  Specifically, the amended 2013 purchase agreement provided:

> <u>Great Falls Royalty Agreement</u>. [Algonquin] shall use commercially reasonable efforts to terminate the royalty agreement between [Algonquin] and [Synergics] pursuant to a termination in form and substance reasonably satisfactory to [Eagle Creek] after the Closing Date.

ECF 37-2 at 2 (quoting § 1(G) of the amended 2013 purchase agreement).  The amended 2013 purchase agreement also required Algonquin to indemnify Eagle Creek and to hold it harmless for the amount of any loss, liability, claim, damage, and expense, including reasonable attorneys' fees, arising out of or in connection with the Royalty Agreement.  ECF 37-2 at 2; *see* Supp. Mem. at 5.

Synergics objects to Eagle Creek's reliance on these provisions from the two versions of the 2013 Algonquin-Eagle Creek purchase agreements.  *See* Motion to Strike (ECF 38).  As

discussed, *infra*, I have not relied upon those provisions, or Eagle Creek's associated arguments, in connection with my decision as to personal jurisdiction over Eagle Creek.

In support of its claim that personal jurisdiction exists as to Eagle Creek, Synergics argues that this Court should find that the forum selection clause, found in the 2000 Purchase Agreement to which Synergics and Algonquin are parties, also extends to and binds Eagle Creek for the purposes of personal jurisdiction.  Opp. at 7-8.

Eagle Creek maintains that it cannot be bound by the forum selection clause found in the 2000 Purchase Agreement between Synergics and Algonquin.  Mem. at 6.  To that end, Eagle Creek observes that it is not a party to the 2000 Purchase Agreement, and notes that Eagle Creek was not formed until 2010, ten years after that agreement became effective.  Mem. at 6. According to Eagle Creek, it "cannot be deemed to have consented to jurisdiction in Maryland based on an agreement that it did not sign and that was signed before it even existed."  *Id.* at 6-7. And, Eagle Creek says, Synergics "has not alleged any circumstance that would justify extending the forum selection clause to Eagle Creek," as it is merely "an unrelated third party" with respect to the 2000 Purchase Agreement containing the forum selection clause.  *Id.* at 7.

In the supplemental briefing submitted after the deposition of Mr. Cherry, Synergics again insists that personal jurisdiction exists over Eagle Creek.  It contends that Eagle Creek was aware of the 2000 Purchase Agreement and Royalty Agreement between Synergics and Algonquin, and knew that Synergics and Algonquin had agreed to litigate disputes arising from those agreements in Maryland.  Supp. Opp. at 5.

In my view, Synergics has failed to establish any valid basis for concluding that Eagle Creek is bound by the forum selection clause found in the 2000 Purchase Agreement.  "[A] valid forum-selection clause is capable of conferring personal jurisdiction upon a defendant under

principles of consent and waiver." *Structural Preservation Systems, LLC v. Andrews*, 931 F. Supp. 2d 667, 671 (D. Md. 2013) (citing *CoStar Realty Info., Inc. v. Meissner*, 604 F. Supp. 2d 757, 763 (D. Md. 2009)). *See Consulting Engineers*, *supra*, 561 F.3d at 281 n.11 ("[A] valid forum selection clause, unlike a choice of law clause, may act as a waiver to objections to personal jurisdiction . . . . 'Parties can consent to personal jurisdiction through forum-selection clauses in contractual agreements.'") (quoting *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 103 (2d Cir. 2006); further citations omitted). However, Eagle Creek was not a signatory to the 2000 Purchase Agreement. Indeed, it was not even in existence in 2000. Cherry Decl. ¶ 3. Nor has Synergics otherwise shown how Eagle Creek consented to be bound by the forum selection clause. Synergics cites no case—and the Court is unaware of one—holding that a third party's mere awareness of a forum selection clause found in a contract between two separate entities is enough to bind the third party.

Several grounds on which other courts have found a third party may be bound by a forum selection clause are absent here. *See, e.g.*, *Adams v. Raintree Vacation Exchange, LLC*, 702 F.3d 436, 439-43 (7th Cir. 2012) (concluding that entity affiliated with signatory to contract could enforce forum selection clause); *Watkins v. M/V London Senator*, 112 F. Supp. 2d 511, 520 (E.D. Va. 2000) (forum selection clause found applicable to third party beneficiary of contract). In any event, Synergics has not invoked any of these grounds as a reason for subjecting Eagle Creek to a forum selection clause found in an agreement between Synergics and Algonquin.

Moreover, neither Synergics's original pleadings nor any information uncovered during jurisdictional discovery plausibly suggest that Eagle Creek assumed any of Algonquin's contractual obligations under either the 2000 Purchase Agreement or the Royalty Agreement. *See* Cherry Decl. ¶ 18; Cherry Dep. at 67. To be sure, in its Supplemental Opposition, plaintiff

suggests that because Eagle Creek "acquired the entity and Hydroelectric Plant from which payments were and continue to be due to Synergics, and admitted that it was aware of the obligations due to Synergics," Eagle Creek therefore "assum[ed] the obligation by purchasing the Hydroelectric Plant."  Supp. Opp. at 3-4.  To the extent plaintiff is suggesting that Eagle Creek has assumed any contractual obligation of Algonquin vis-à-vis Synergics regarding the royalty payments, that suggestion is contradicted by plaintiff's own allegations.  After all, Synergics has raised no breach of contract claim against Eagle Creek or otherwise alleged that Eagle Creek is liable for Algonquin's own contractual obligations.  Nor does Synergics point to any fact undermining Eagle Creek's contention that it never assumed any of Algonquin's obligations under the Royalty Agreement or the 2000 Purchase Agreement.  Indeed, plaintiff appears to conflate a transfer of assets from Algonquin to Eagle Creek, through a separate purchase agreement, with an assumption by Eagle Creek of Algonquin's existing obligations under the 2000 agreements.  In any event, plaintiff has not plausibly alleged any assumption by Eagle Creek of any obligation toward Synergics.

In several instances, including in connection with the forum selection clause argument, Synergics relies on *Burger King Corp. v. Rudzewicz*, *supra*, 471 U.S. 462.  *See, e.g.*, Opp. at 7, 9-10; Supp. Opp. at 8.  In a passage cited by Synergics, the Supreme Court observed that, in an "'appropriate case,'" a court "may evaluate 'the burden on the defendant,' 'the forum State's interest in adjudicating the dispute,' 'the plaintiff's interest in obtaining convenient and effective relief,' 'the interstate judicial system's interest in obtaining the most efficient resolution of controversies,' and the 'shared interest of the several States in furthering fundamental substantive social policies.'"  471 U.S. at 477 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)).  Those factors, the *Burger King* Court acknowledged,

"sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." 471 U.S. at 477.  However, such factors are to be considered "[o]nce it has been decided that a defendant purposefully established minimum contacts within the forum State . . . ." *Id.* at 476.  As such, even if those considerations weighed squarely in favor of this Court's exercise of personal jurisdiction—and it is far from clear that they do—those factors do not support Synergics's effort to extend the forum selection clause to Eagle Creek.

In addition to Synergics's argument based on the forum selection clause, it also maintains that this Court's exercise of personal jurisdiction over Eagle Creek is consistent with statutory and constitutional requirements.  As noted, "to assert personal jurisdiction over a nonresident defendant, two conditions must be satisfied: (1) the exercise of jurisdiction must be authorized under the state's long-arm statute; and (2) the exercise of jurisdiction must comport with the due process requirements of the Fourteenth Amendment."  *Carefirst of Maryland*, 334 F.3d at 396.

Regarding the statutory basis for personal jurisdiction, plaintiff invokes three aspects of Maryland's long-arm statute.  Supp. Opp. at 6.  Those portions of the long-arm statute allow "personal jurisdiction over a person, who directly or by an agent":

> (1) Transacts any business or performs any character of work or service in the State;
> (2) Contracts to supply goods, food, services, or manufactured products in the State; [or]
> (3) Causes tortious injury in the State by an act or omission in the State[.]

C.J. § 6-103(b)(1) - (3).  Further, C.J. § 6-103(a) provides: "If jurisdiction over a person is based solely upon this section, he may be sued only on a cause of action arising from any act enumerated in this section."

Turning first to C.J. § 6-103(b)(3), plaintiff's argument under that subsection is meritless. Plaintiff notes that Maryland's long-arm statute "provides for the filing of a lawsuit against a person who causes injury or damages within Maryland," and asserts that "the improper transaction between Algonquin and Eagle Creek," and the associated failure to pay royalty payments that Synergics was allegedly owed, caused injury to Synergics in Maryland. Opp. at 8. However, Synergics has raised no tort claim against either defendant.

As for C.J. § 6-103(b)(2), the record does not suggest that Eagle Creek, or any agent, "[c]ontracts to supply goods, food, services, or manufactured products" in Maryland. Synergics does not dispute Eagle Creek's claim that electricity generated by the Hydroelectric Plant is used by nearby consumers in New Jersey, nor does it otherwise argue that Eagle Creek supplies electricity to Maryland customers. That leaves only C.J. § 6-103(b)(1), which Maryland courts have consistently deemed to be coextensive with the constitutional due process limitation on personal jurisdiction. *See Carefirst of Maryland*, 334 F.3d at 396-97; *see also, e.g.*, *Fyfe Co., LLC v. Structural Group, LLC*, 2013 WL 2370497, at *3 (D. Md. May 30, 2013). Accordingly, in this case, the statutory and constitutional analyses merge into one.

Eagle Creek insists that its Maryland contacts "are too random and attenuated to conclude that Eagle Creek purposefully availed itself of the laws of Maryland, or that it reasonably should have anticipated being subject to suit here." Supp. Mem. at 7-8. It cites numerous factors that, in its view, demonstrate its lack of Maryland contacts. As noted, *supra*, Eagle Creek maintains no business presence in Maryland; owns no real estate in Maryland; has no offices, warehouses or other business locations in Maryland; is not registered to do business in Maryland; has no registered agent for service of process in Maryland; has no Maryland bank account; purchases no materials or supplies from Maryland vendors; has never sued or been sued in Maryland;

maintains no company records in Maryland; pays no Maryland taxes; and it does not advertise products or services in Maryland via mail or in print.  Cherry Decl. ¶¶ 7-9, 12-14.  Moreover, neither Eagle Creek nor the approximately 40 companies it owns have employees located in Maryland.  *See* Cherry Decl. ¶ 6; Cherry Dep. at 59, 65.  Significantly, Synergics does not dispute these contentions.  And, as noted, Synergics does not question Eagle Creek's claim that the Hydroelectric Plant's electricity is used in New Jersey.

Rather, Synergics relies heavily on Eagle Creek's ownership interest in two Maryland entities.  Opp. at 10.  It is undisputed that Eagle Creek has ownership interests in two Maryland entities—the Great Falls Project Company and Great Falls Energy—as a result of its 2013 transaction with Algonquin.[8]  Nor is it contested that the Great Falls Project Company owns the Hydroelectric Plant in Paterson, New Jersey that is implicated in this suit.

However, in *Mylan Laboratories*, the Fourth Circuit stated that a non-forum parent entity "'is not construed as doing business within a state merely because of its ownership of all of the shares of stock of another corporation doing business in the state.'"  *Id.* at 63 (quoting *Vitro Elec. v. Milgray Elec., Inc.*, 255 Md. 498, 502, 258 A.2d 749, 751 (1969)).  Indeed, it is well settled that "[a] corporation exists as a legal entity separate and distinct from its corporate shareholders."  *Cancun Adventure Tours, Inc. v. Underwater Designer Co.*, 862 F.2d 1044, 1047 (4th Cir. 1988).  "Under the doctrine of limited liability, a shareholder—including a corporate parent—may not be held liable for the acts of a corporation."  *Allen v. Bank of Am. Corp.*, 2011 WL 3654451, at *3 n.4 (D. Md. Aug. 18, 2011) (citing *Johnson v. Flowers Indus., Inc.*, 814 F.2d 978, 980 (4th Cir. 1987)).  "Th[is] concept is expressed by the colorful metaphor of the corporate veil, which presumes that acts of the corporation are not acts of the shareholder."  *Johnson*, 814

---

[8] As indicated, it is undisputed that among the approximately 40 entities that Eagle Creek owns, only the Great Falls Project Company and Great Falls Energy were formed or are registered to do business in Maryland.  *See* Cherry Dep. at 17, 50-51.

F.2d at 980.  The corporate veil doctrine "is a basic attribute of the corporate form; it encourages business investment and fosters stability in commercial transactions."  *Cancun Adventure*, 862 F.2d at 1047.

In the context of liability, which is instructive as to the jurisdictional issue presented here, an LLC is treated like a corporation.  *See Allen v. Dackman*, 413 Md. 132, 153, 991 A.2d 1216, 1228-29 (2010).  Moreover, under the Maryland Code (2007 Repl. Vol., 2013 Supp.), § 4A-301 of the Corporations & Associations Article, members of limited liability companies are not "personally liable for the obligations of the limited liability company, whether arising in contract, tort or otherwise, solely by reason of being a member of the limited liability company."

As the Maryland Court of Appeals observed in *Bart Arconti & Sons, Inc. v. Ames-Ennis, Inc.*, 275 Md. 295, 310, 340 A.2d 225, 234 (1975), in the absence of fraud or unless necessary to enforce a paramount equity, shareholders are generally not liable for the acts of a corporation.  In particular, the court said, *id.*, 340 A.2d at 234:

> [T]he most frequently enunciated rule in Maryland is that although courts will, in a proper case, disregard the corporate entity and deal with substance rather than form, as though a corporation did not exist, shareholders generally are not held individually liable for debts or obligations of a corporation except where it is necessary to prevent fraud or enforce a paramount equity.

In *Mylan Laboratories*, the plaintiff relied on an agency theory in support of its argument that personal jurisdiction existed over a parent entity based upon the forum activities of a wholly owned subsidiary.  *See Mylan Laboratories*, 2 F.3d at 61; *see also, e.g.*, *Estate of Thomson v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 362 (6th Cir. 2008) (recognizing "the use of the alter-ego theory to exercise personal jurisdiction").  In Maryland, "the 'agency' test is used in analyzing whether or not to pierce the corporate veil for personal jurisdiction purposes."  *Haley*

*Paint*, *supra*, 775 F. Supp. 2d at 797 (citing *Mylan Labs.*, 2 F.3d at 61).[9]   Under that test, a court

may "attribute the actions or contacts of a subsidiary corporation to the foreign parent

corporation 'only if the parent exerts considerable control over the activities of the subsidiary.'"

*Id.* (quoting *Mylan Laboratories*, 2 F.3d at 61).   Factors relevant to that determination include

"(1) 'whether significant decisions of the subsidiary must be approved by the parent'; (2)

'whether the parent and the subsidiary maintain separate books and records, employ separate

accounting procedures, and hold separate directors' meetings'; and (3) 'the level of

interdependence between parent and subsidiary.'"   *Id.* (quoting *Mylan Laboratories*, 2 F.3d at

61).   A court must also consider the subsidiary's level of independence from the parent entity.

*See id.*

Here, however, Synergics plainly has not raised an alter-ego or veil-piercing theory in

connection with its personal jurisdiction argument.   Nor has plaintiff suggested how Eagle

Creek's indirect ownership of partnership interests in the Great Falls Project Company, through

its direct ownership of Eagle Creek Northeast, provides a basis for personal jurisdiction in

Maryland.   Instead, plaintiff insists, without further elaboration, that Eagle Creek's indirect

ownership interest in two Maryland entities is, on its own, sufficient for this Court to exercise

personal jurisdiction in this case.

Moreover, even if Synergics had invoked an alter-ego or veil-piercing theory, it is

apparent that Synergics falls well short of identifying facts that could support such a theory.   In

this regard, *Haley Paint Co*, *supra*, 775 F. Supp. 2d 790, is instructive.   As an initial matter, in

---

[9] Because Synergics does not pursue a veil-piercing argument, the parties do not address
the law that would be applicable to such an argument.   In the absence of any guidance from the
parties, for the sake discussion I will rely on relevant principles of Maryland law.   If Maryland
law applies in this case, it is noteworthy that "'Maryland generally is more restrictive than other
jurisdictions in allowing a plaintiff to pierce the corporate veil.'"   *Haley Paint*, 775 F. Supp. 2d
at 797 (quoting *Rheumatology Nurses Soc'y, Inc. v. Phoenix Grp. Holdings, LLC*, 2009 WL
249233, at *3 (D. Md. Jan. 8, 2009)).

*Haley Paint*, *id.* at 798-99, Judge Bennett concluded that the pleading standards articulated by the Supreme Court in *Twombly*, *supra*, 550 U.S. 544, and *Iqbal*, *supra*, 556 U.S. 662, also apply to a plaintiff's jurisdictional allegations.  *See also* Fed. R. Civ. P. 8(a)(1) (requiring a plaintiff to provide "a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support").  He noted that, although neither the Supreme Court nor the Fourth Circuit had specifically addressed pleading requirements in the context of jurisdictional allegations, other courts have implicitly adopted the pleading requirements of *Twombly* and *Iqbal*.  *Id.* at 798 (collecting cases).

In seeking to establish personal jurisdiction over a parent by virtue of service of process on its subsidiary, the plaintiffs in *Haley Paint* alleged that the parent "exerted considerable control over the activities and operations" of its subsidiary, and claimed that the parent held a "direct and controlling ownership interest in the subsidiary," controlled the subsidiary's "marketing, purchasing, pricing, management, and/or operating policies," and approved its "significant business decisions."  775 F. Supp. 2d at 799-800.  However, the *Haley Paint* Court found that the plaintiffs' "broad allegations" as to control were insufficient to justify piercing the corporate veil in order to exercise personal jurisdiction over the parent, *id.* at 800, particularly as the subsidiary was a separate corporate entity, held its own articles of incorporation, maintained its own corporate records, and filed its own taxes.  *See id.* at 793.[10]

Similarly, *in Newman v. Motorola, Inc.*, 125 F. Supp. 2d 717, 723 (D. Md. 2000), Judge Blake declined to pierce the veil in order to obtain personal jurisdiction over a corporate parent, even though the subsidiary's Securities and Exchange Commission filings indicated that the

---

[10] In *Haley Paint*, the district court denied the plaintiff's request for discovery as to the jurisdictional issue.  *Id.* at 801.  Here, by contrast, Synergics had the opportunity to conduct a deposition of Eagle Creek's CEO.  As such, it is appropriate to hold Synergics, at minimum, to the standard adopted by the *Haley Paint* Court, where the plaintiff had *no* opportunity for jurisdictional discovery.

parent "will control [the subsidiary's] management and affairs," the two entities had filed consolidated financial statements and tax returns, and the parent could appoint a majority of the subsidiary's board of directors.

In any event, Synergics advances no legal basis, beyond the bare fact of Eagle Creek's ownership interests in two Maryland entities, permitting the Court to exercise personal jurisdiction over Eagle Creek.   In addition, the record is essentially devoid of information concerning either the Great Falls Project Company or Great Falls Energy, including information of the sort examined by the district courts in *Haley Paint* and *Newman*.   Synergics has fallen far short of identifying factual grounds that could warrant exercising personal jurisdiction over Eagle Creek based upon its ownership interests.   Nor is it apparent that plaintiff's "claims arise out of [the defendant's] activities directed at" Maryland.   *See Consulting Engineers*, *supra*, 561 F.3d at 278.   After all, plaintiff's claims most clearly arise from Algonquin's alleged breach of multiple contracts, rather than from conduct perpetrated by the forum entities—the Great Falls Project Company and Great Falls Energy—which are not defendants in this matter.

Nor do Synergics's other arguments, either independently or when viewed in connection with its other claims, amount to an adequate showing as to why personal jurisdiction over Eagle Creek is appropriate.   In several instances, Synergics's argument amounts to a claim that, because Synergics and Algonquin agreed to litigate contract disputes in Maryland, and because Synergics's claim against Eagle Creek relates to the same underlying facts, considerations of efficiency weigh in favor of this Court's exercise of personal jurisdiction over Eagle Creek.   *See, e.g.*, Opp. at 7 (noting that "all claims arise from a common set of operative facts warranting resolution of all claims in a single proceeding"); Supp. Opp. at 5 (finding a lack of personal jurisdiction over Eagle Creek would "require two separate forums for one set of facts," thus

"present[ing] the judicially inefficient possibility of conflicting fact finding and application of law") and 9 (invoking, *inter alia*, the Court's "'interest in obtaining the most efficient resolution of controversies'") (quoting *Burger King*, 471 U.S. at 476-77).   However, plaintiff's tempting appeals to judicial economy and efficiency are no substitute for an actual showing as to how Eagle Creek has purposefully availed itself of this forum.

On several other occasions, plaintiff invokes aspects of this litigation that pertain not to Eagle Creek, but rather to the dispute between Synergics and Algonquin.  *See, e.g.*, Supp. Opp. at 9 (asserting that breaches of contracts occurred in Maryland).   Plaintiff also seeks to rely on its *own* Maryland presence as a basis for jurisdiction over Eagle Creek, pointing to Eagle Creek's "knowledge of the continuing obligations to a Maryland entity"—Synergics—as well as "the continuing interest of a Maryland entity"—again, Synergics—"in the cash flow and revenue of the Hydroelectric Plant."  Supp. Opp. at 4-5.  Plaintiff's arguments that personal jurisdiction exists because Eagle Creek could have foreseen the possibility of litigation, and anticipated that such litigation would occur in Maryland, are unconvincing.  Supp. Opp. at 5, 8-9; *see World-Wide Volkswagen*, 444 U.S. at 29 ("'foreseeability' alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause").

In sum, I am not persuaded that plaintiff has identified any ground permitting this Court to exercise personal jurisdiction in this suit as to Eagle Creek.  Plaintiff's argument, taken as a whole, is not greater than the sum of its parts.  Because plaintiff has failed to make a prima facie showing as to how personal jurisdiction exists over Eagle Creek, Eagle Creek's motion to dismiss, based on lack of personal jurisdiction, shall be granted.

**B. Synergics's Motion to Strike**

Synergics also moves to strike Exhibit 2 of Eagle Creek's Supplemental Memorandum, a letter of January 23, 2014, written by defense counsel to Synergics's counsel, and which refers to selected portions of the 2013 purchase agreement executed by Eagle Creek and Algonquin. In Synergics's view, "the letter is self-serving and Eagle Creek has not disclosed the [2013] Purchase Agreement between Eagle Creek and Algonquin in its entirety." Supp. Opp. at 10.

According to Synergics, "Eagle Creek cannot rely on portions of the [2013] Purchase Agreement to support its position without providing Synergics with the opportunity to appropriately respond to arguments related to the contents of the Purchase Agreement and other documents." *Id.* Synergics notes that, prior to the deposition of Eagle Creek's corporate designee, it demanded the production of various documents, including documents pertaining to Eagle Creek's transaction with Algonquin, but Eagle Creek refused that request. Supp. Opp. at 10. Despite Eagle Creek's refusal to provide such documents prior to the deposition, Synergics adds, Eagle Creek seeks to rely on selected portions of those documents following the deposition. *Id.* at 10-11. Accordingly, Synergics asks the Court to strike the letter itself, and to also "strike all references made by Eagle Creek in its Supplemental Motion to Dismiss as to the [2013] Purchase Agreement executed between Eagle Creek and Algonquin." *Id.* Notably, plaintiff does not cite a single case, statute, rule, or any other authority in connection with its Motion to Strike. *See* Supp. Opp. at 10-11; ECF 40.

Preliminarily, I note that Synergics's contentions are, in a sense, at odds with its prior requests—or lack thereof—for particular forms of discovery. On November 11, 2013, plaintiff filed a motion seeking leave to conduct depositions that, in its view, would be relevant to jurisdictional issues, along with "additional discovery related to the issue of jurisdiction as may

be required to resolve this matter." *See* ECF 30 ¶ 6.  Significantly, the motion made no reference

to document requests.  On December 5, 2013, the Court issued an Order in which it "permit[ted]

Synergics to conduct limited discovery pertaining solely to the issue of personal jurisdiction as to

Eagle Creek." *See* ECF 36.  In particular, discovery was limited to "one Rule 30(b)(6) corporate

designee deposition, no longer than two hours, concerning Eagle Creek's contacts with

Maryland, if any." *Id.*  The Order did not authorize other forms of discovery, such as requests

for production of documents, but no such discovery had been sought by plaintiff.  *See id.*  And,

when plaintiff's disagreement with Eagle Creek over a request for documents emerged prior to

the deposition of Mr. Cherry, plaintiff did not seek relief from the Court.  Moreover, plaintiff

does not seek additional discovery prior to the Court's ruling on Eagle Creek's motion to dismiss

for lack of personal jurisdiction.  Rather, plaintiff merely seeks to preclude Eagle Creek from

relying on portions of documents in dispute.[11]

     As for the merits of Synergics's argument, counsel's letter of January 23, 2014, and the

related contentions found in Eagle Creek's Supplemental Memorandum are immaterial to this

Court's finding that Synergics has failed to make a prima facie showing that personal jurisdiction

exists over Eagle Creek.  The provisions quoted in the letter do little to advance Eagle Creek's

affirmative arguments in favor of dismissal.  In any event, given plaintiff's Motion to Strike, I

will not consider the information offered by Eagle Creek as a basis for my decision regarding

---

[11] In the letter of January 23, 2014, counsel for defendants asserted that the two versions of the 2013 purchase agreement "are confidential, proprietary, and commercially sensitive in nature, and are subject to non-disclosure obligations.  Accordingly, Eagle Creek will not produce copies of either [version] absent the entry of a protective order." ECF 37-2 at 2.  Eagle Creek also maintains that Synergics failed to implement a protective order or to respond to a draft protective order provided by Eagle Creek on February 4, 2014, *see* ECF 39 at 6, although Synergics's argument highlights its purported need for such documents earlier, before the deposition of Mr. Cherry. *See, e.g.*, ECF 40 at 2.

Eagle Creek's motion to dismiss.  Nevertheless, in light of my decision to grant Eagle Creek's motion to dismiss for lack of personal jurisdiction, I will deny the Motion to Strike, as moot.

## C.  Eagle Creek's motion to dismiss under Rule 12(b)(6)

Eagle Creek has also moved to dismiss under Fed. R. Civ. P. 12(b)(6), alleging failure to state a claim.  *See* Motion to Dismiss at 1; Mem. at 9-13.  Because I conclude that personal jurisdiction does not exist as to Eagle Creek, I will deny, as moot, the motion to dismiss under Fed. R. Civ. P. 12(b)(6).

## D.  Algonquin's motion to dismiss Synergics's claim for attorneys' fees under Rule 12(b)(6)

In the Complaint, Synergics alleges: "As a result of Algonquin's breaches of the [2000] Purchase Agreement, Synergics is entitled to an award of attorney's fees, costs, and expenses." *Id.* ¶ 21; *see also id.* ¶ 23.  In support of that claim, Synergics cites the 2000 Purchase Agreement, Art. IX, § 9.1(b), under which Algonquin is to indemnify Synergics for "Indemnifiable Losses" suffered by Synergics as a result of, *inter alia*, "any breach by [Algonquin] of any representation, warranty, covenant or agreement of [Algonquin] contained in" the 2000 Purchase Agreement.  Synergics also asserts that, in the previous subsection, Art. IX, § 9.1(a), the term "Indemnifiable Loss" is defined to include reasonable attorneys' fees.  *See* Complaint ¶ 22.

Algonquin has moved to dismiss Synergics's claim for attorneys' fees pursuant to Fed. R. Civ. P. 12(b)(6).  *See* ECF 14.  According to Algonquin, the 2000 Purchase Agreement does not provide for attorneys' fees in actions between the parties and, to the contrary, requires Synergics and Algonquin to bear their own costs.  *See* ECF 14-1 at 2-4.  Synergics counters that the 2000 Purchase Agreement expressly provides for the recovery of attorneys' fees in the event Algonquin breaches that agreement, including in actions between the parties.  *See* ECF 23 at 4-6.

The 2000 Purchase Agreement contains several provisions relevant to Algonquin's motion to dismiss Synergics's claim for attorneys' fees.  Art. VII, § 7.2 provides:

> Except to the extent specifically provided herein, whether or not the transactions contemplated hereby are consummated, all costs and expenses incurred with this Agreement and the transactions contemplated hereby shall be borne by the party incurring such costs and expenses, including, without limitation, any expenses associated with litigation arising out of this Agreement or any of the transactions contemplated hereunder . . . .

Also pertinent to the attorneys' fees issue are two subsections of Art. IX, § 9.1.   In relevant part, Art. IX, § 9.1(a) states:

> [Synergics] will indemnify, defend and hold harmless [Algonquin] from and against any and all claims, demands or suits (by any Person not a party (or Affiliate thereof) to this Agreement), losses, liabilities, damages (but excluding any consequential, special, indirect, punitive or incidental damages, including, without limitation lost profits), obligations payments, costs and expenses (including, without limitation, the costs and expenses of any and all actions, suits, proceedings, assessments, penalties, fines, judgments, settlements and compromises relating thereto, reasonable disbursements in connection therewith, reasonable attorneys' and consultants' fees) to the extent the foregoing are not covered by insurance (each, an "Indemnifiable Loss"), asserted against or suffered by [Algonquin] . . . .

Subsection (b) states:

> [Algonquin] will indemnify, defend and hold harmless [Synergics] from and against any Indemnifiable Losses asserted against or suffered by [Synergics] relating to, resulting from or arising out of:  (i) any breach by [Algonquin] of any representation, warranty, covenant or agreement of [Algonquin] contained in this Agreement; or (ii) the Interests, the [Great Falls Project Company], or the Hydroelectric Plant for claims made after the Closing Date.

As indicated, the 2000 Purchase Agreement provides that it "shall be governed by and construed in accordance with the laws of the State of Maryland . . . ."   *Id.* Art. X, § 10.6 ("Governing Law").  Maryland adheres to the common law "American rule," under which each party is required to bear its own costs, "'unless (1) the parties to a contract have an agreement to that effect, (2) there is a statute that allows the imposition of such fees, (3) the wrongful conduct

- 35 -

of a defendant forces a plaintiff into litigation with a third party, or (4) a plaintiff is forced to defend against a malicious prosecution.'" *Nova Research, Inc. v. Penske Truck Leasing Co.*, 405 Md. 435, 445, 952 A.2d 275, 281 (2008) (quoting *Thomas v. Gladstone*, 386 Md. 693, 699, 874 A.2d 434, 437 (2005)); *see also, e.g.*, *Baer v. GMAC Mortg., LLC*, 2013 WL 5945654, at *4 (D. Md. Nov. 5, 2013) (citing *Thomas*).

Here, Synergics's claim to attorneys' fees rests on a contractual provision that, according to Synergics, allows for recovery of attorneys' fees. *See, e.g.*, *Nova Research*, 405 Md. at 449, 952 A.2d at 284 ("The scope of indemnification is a matter of contract interpretation . . . ."). "Contract provisions providing for awards of attorney's fees to the prevailing party in litigation under the contract generally are valid and enforceable in Maryland." *Myers v. Kayhoe*, 391 Md. 188, 207, 892 A.2d 520, 532 (2006).[12]  "An express indemnity agreement, being a written contract, must be construed in accordance with the traditional rules of contract interpretation." *Ulico Cas. Co. v. Atl. Contracting & Material Co., Inc.*, 150 Md. App. 676, 692, 822 A.2d 1257, 1266 (2003), *aff'd*, 380 Md. 285, 844 A.2d 460 (2004); *accord Thomas v. Capital Medical Management Associates, LLC*, 189 Md. App. 439, 468, 985 A.2d 51, 68 (2009).

Under Maryland law, "'[t]he cardinal rule of contract interpretation is to give effect to the parties' intentions.'" *Dumbarton Imp. Ass'n, Inc. v. Druid Ridge Cemetery Co.*, 434 Md. 37, 51, 73 A.3d 224, 232 (2013) (quoting *Tomran, Inc. v. Passano*, 391 Md. 1, 14, 891 A.2d 336, 344 (2006)); *see Sy-Lene of Washington, Inc. v. Starwood Urban Retail II, Inc.*, 376 Md. 157, 166,

---

[12] I note that "Maryland law limits the amount of contractual attorneys['] fees to actual fees incurred, regardless of whether the contract provides for a greater amount." *SunTrust Bank v. Goldman*, 201 Md. App. 390, 398, 29 A.3d 724, 728 (2011).  As such, "[e]ven in the absence of a contract term limiting recovery to reasonable fees, trial courts are required to read such a term into the contract and examine the prevailing party's fee request for reasonableness." *Myers*, 391 Md. at 207, 892 A.2d at 532.  When a court assesses the reasonableness of attorneys' fees, the party seeking recovery bears the burden to supply evidence establishing reasonableness. *Atlantic Contracting & Material Co., Inc. v. Ulico Cas. Co.*, 380 Md. 285, 316, 844 A.2d 460, 478 (2004) (citation omitted).

829 A.2d 540, 546 (2003).  To determine the parties' intentions, courts first look to the written language of the contract.  *Id.*  "'The words employed in the contract are to be given their ordinary and usual meaning, in light of the context within which they are employed.'" *DIRECTV, Inc. v. Mattingly*, 376 Md. 302, 313, 829 A.2d 626, 632-33 (2003) (quoting *Wells v. Chevy Chase Bank, F.S.B.*, 363 Md. 232, 251, 768 A.2d 620, 630 (2001)).

When a contract's language is clear and unambiguous, "its construction is for the court to determine."  *Wells*, 363 Md. at 251, 768 A.2d at 630; *see DIRECTV, Inc.*, 376 Md. at 312, 829 A.2d at 632 ("[W]here the language employed in a contract is unambiguous, a court shall give effect to its plain meaning and there is no need for further construction by the court.").  A court will presume that the parties meant what they stated in an unambiguous contract, without regard to what the parties to the contract personally thought it meant or intended it to mean.  *See Dumbarton*, 434 Md. at 51, 73 A.3d at 232; *Dennis v. Fire & Police Employees Ret. Sys.*, 390 Md. 639, 656, 890 A.2d 737 (2006); *PaineWebber Inc. v. East*, 363 Md. 408, 414, 768 A.2d 1029 (2001); *Auction & Estate Representatives, Inc. v. Ashton*, 354 Md. 333, 340, 731 A.2d 441, 444 (1999).

Moreover, a court will not "add or delete words to achieve a meaning not otherwise evident from a fair reading of the language used."  *Brensel v. Winchester Constr. Co.*, 392 Md. 601, 624, 898 A.2d 472, 485 (2006).  "It is a fundamental principle of contract law that it is 'improper for the court to rewrite the terms of a contract, or draw a new contract for the parties, when the terms thereof are clear and unambiguous, simply to avoid hardships.'"  *Calomiris v. Woods,* 353 Md. 425, 445, 727 A.2d 358, 368 (1999) (quoting *Canaras v. Lift Truck Servs.*, 272 Md. 337, 350, 322 A.2d 866, 873 (1974)); *see Loudin Ins. Agency, Inc. v. Aetna Cas. & Sur. Co.*,

966 F.2d 1443, 1992 WL 145269, at *5 (4th Cir. 1992) (per curiam) ("[A] court will not rewrite the parties' contract simply because one party is no longer satisfied with the bargain he struck.").

A "contract is ambiguous if it is subject to more than one interpretation when read by a reasonably prudent person." *Sy-Lene of Washington*, 376 Md. at 167, 829 A.2d at 547; *see Cochran v. Norkunas*, 398 Md. 1, 17, 919 A.2d 700, 710 (2007); *Auction & Estate Representatives, Inc. v. Ashton*, 354 Md. 333, 340, 731 A.2d 441, 444-45 (1999); *Calomiris v. Woods*, 353 Md. 425, 436, 727 A.2d 358, 363 (1999).   To determine whether a contract is ambiguous, a court considers "the character of the contract, its purpose, and the facts and circumstances of the parties at the time" that they enter into the contract. *Pacific Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 388, 488 A.2d 486, 488 (1985); *see Young v. Anne Arundel Cnty.*, 146 Md. App. 526, 587, 807 A.2d 651, 687 (2002), *cert. denied,* 372 Md. 432, 813 A.2d 259 (2002); *University of Baltimore v. Iz*, 123 Md. App. 135, 162, 716 A.2d 1107, 1121 (1998), *cert. denied*, 351 Md. 663, 719 A.2d 1262 (1998).

In the context of a motion to dismiss, the construction of an ambiguous contract "'is a question of fact which, if disputed, is not susceptible of resolution under a motion to dismiss for failure to state a claim.'" *Horlick v. Capital Women's Care, LLC*, 896 F. Supp. 2d 378, 394 (D. Md. 2011) (applying Maryland contract law; quoting *Wolman v. Tose*, 467 F.2d 29, 34 (4th Cir. 1972)); *see also Martin Marietta Corp. v. Int'l Telecomm. Satellite Org.*, 991 F.2d 94, 98 (4th Cir. 1992) (applying Maryland contract law; reversing trial court's grant of a motion to dismiss because the contract in issue was "not free of ambiguity"); *Hardwire LLC v. Goodyear Tire & Rubber Co.*, 360 F. Supp. 2d 728, 736 (D. Md. 2005) (applying Ohio contract law and noting that "an ambiguous contract provision is a factual determination that precludes dismissal on a motion for failure to state a claim").

"If the contract is ambiguous," the court may, at an appropriate time, "consider any extrinsic evidence which sheds light on the intentions of the parties at the time of the execution of the contract." *Cnty. Commissioners of Charles Cnty. v. St. Charles Associates Ltd. P'ship*, 366 Md. 426, 445, 784 A.2d 545, 556 (2001); *accord John L. Mattingly Const. Co., Inc. v. Hartford Underwriters Ins. Co.*, 415 Md. 313, 327, 999 A.2d 1066, 1074 (2010). In the context of summary judgment, if "extrinsic evidence . . . leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must . . . be refused and interpretation left to the trier of fact.'" *Basile Baumann Prost Cole & Assocs., Inc. v. BBP & Assocs. LLC*, 875 F. Supp. 2d 511, 526 (D. Md. 2012) (quoting *Washington Metro. Area Transit. Auth. v. Potomac Inv. Props., Inc.*, 476 F.3d 231, 234 (4th Cir. 2007)).

Regarding the interpretation of indemnification provisions, the Maryland Court of Appeals has observed: "'Most courts distinguish between the recovery of attorney's fees incurred in defending against the third-party claim and those expended in prosecuting a claim against the indemnitor. Unless the indemnity provision expressly permits the recovery of fees incurred in prosecuting claims against the indemnitor, such fees are not recoverable.'" *Nova Research*, 405 Md. at 453, 952 A.2d at 287 (quoting Philip L. Bruner & Patrick J. O'Connor, Jr., 3 Construction Law § 10:51 (2007). Moreover, "'contractual attorney's fees provisions must be strictly construed to avoid inferring duties that the parties did not intend to create[.]'" *Nova Research*, 405 Md. at 455, 952 A.2d at 287 (quoting Robert L. Rossi, Attorneys' Fees § 9:18 (3d ed. 2002, Cum. Supp. 2007)).

Turning to the parties' contentions, Algonquin relies in part on a provision of the 2000 Purchase Agreement that, in its view, "require[s] that each party bear its own costs and

attorneys' fees incurred in connection with litigation arising out of" that agreement.  ECF 29 at 2.

As noted, Art. VII, § 7.2, states:

> Except to the extent specifically provided herein, whether or not the transactions contemplated hereby are consummated, all costs and expenses incurred with this Agreement and the transactions contemplated hereby shall be borne by the party incurring such costs and expenses, including, without limitation, any expenses associated with litigation arising out of this Agreement or any of the transactions contemplated hereunder . . . .

Art. VII, § 7.2 is central to the interpretive question before the Court.  Nevertheless, when interpreting a contract, a court will "look to the entire . . . agreement, not merely a portion thereof."  *Nova Research*, 405 Md. at 448; 952 A.2d at 283.  Moreover, the first clause of § 7.2—"[e]xcept to the extent specifically provided herein"—arguably allows other provisions of the 2000 Purchase Agreement, including Art IX, § 9.1, to override the general rule reflected in Art. VII, § 7.2.

There is no dispute that Synergics may recover certain "Indemnifiable Losses" from Algonquin, pursuant to Art. IX, § 9.1(b).  As indicated, that provision states:

> [Algonquin] will indemnify, defend and hold harmless [Synergics] from and against any Indemnifiable Losses asserted against or suffered by [Synergics] relating to, resulting from or arising out of:  (i) any breach by [Algonquin] of any representation, warranty, covenant or agreement of [Algonquin] contained in this Agreement; or (ii) the Interests, the [Great Falls Project Company], or the Hydroelectric Plant for claims made after the Closing Date.

Much of the parties' disagreement centers on Art. IX, § 9.1(a).  Although that subsection addresses the scenario in which Algonquin seeks indemnification from Synergics (in other words, the inverse of the situation presented in this case), it also supplies the definition of the term "Indemnifiable Loss(es)," which also appears in § 9.1(b).  For convenience, I will restate Art. IX, § 9.1(a), in relevant part:

> [Synergics] will indemnify, defend and hold harmless [Algonquin] from and against any and all claims, demands or suits (by any Person not a party (or

Affiliate thereof) to this Agreement), losses, liabilities, damages (but excluding any consequential, special, indirect, punitive or incidental damages, including, without limitation lost profits), obligations payments, costs and expenses (including, without limitation, the costs and expenses of any and all actions, suits, proceedings, assessments, penalties, fines, judgments, settlements and compromises relating thereto, reasonable disbursements in connection therewith, reasonable attorneys' and consultants' fees) to the extent the foregoing are not covered by insurance (each, an "Indemnifiable Loss"), asserted against or suffered by [Algonquin] . . . .

In Algonquin's view, the clause "by any Person not a party (or Affiliate thereof) to this Agreement," found in Art. IX, § 9.1(a), modifies the entire definition of "Indemnifiable Loss," such that recovery of attorneys' fees is barred in suits between Synergics and Algonquin, as parties to the 2000 Purchase Agreement. *See* ECF 14-1 at 3-4; ECF 29 at 2.

I am unpersuaded that Art. IX, § 9.1(a) unambiguously restricts the scope of "Indemnificable Losses" in the manner that Algonquin suggests. At most, there is ambiguity as to whether recovery of attorneys' fees is limited, as Algonquin insists, to only third-party suits, brought by a "[p]erson not a party" to the 2000 Purchase Agreement. In my view, one could reasonably read the clause "[p]erson not a party" to modify, at most, the three preceding terms— "claims, demands or suits"—and therefore *not* to modify the subsequent items recognized as "Indemnifiable Losses," including "attorneys' . . . fees." Nor does Art. VII, § 7.2 unambiguously foreclose the possibility that Synergics can recover attorneys' fees in this case pursuant to Art. IX, § 9.1.

Notably, this is not an instance in which the relevant contract makes no mention of "attorneys' fees." To the contrary, the 2000 Purchase Agreement expressly provides for the recovery of attorneys' fees under certain circumstances; the core issue is whether attorneys' fees are warranted where, as here, parties to the contract are engaged in litigation with one another. I also note that Art. IX, § 9.1(b) allows for recovery of "Indemnifiable Losses" by Synergics based

upon "any breach by [Algonquin] of any representation, warranty, covenant or agreement of [Algonquin] contained in" the 2000 Purchase Agreement, which is precisely the situation alleged by Synergics in this case.   The inclusion of that language in § 9.1(b) lends credence to Synergics's contention that attorneys' fees are recoverable in connection with litigation between the parties to the 2000 Purchase Agreement.

In short, the relevant provisions are insufficiently clear to allow this Court to determine their unambiguous meaning at this stage of the litigation.   Accordingly, Algonquin's motion to dismiss Synergics's claim for attorneys' fees will be denied.[13]

### IV.  Conclusion

For the foregoing reasons, Eagle Creek's motion to dismiss for lack of personal jurisdiction is granted; Eagle Creek's motion to dismiss under Rule 12(b)(6) is denied, as moot; Synergics's Motion to Strike is denied, as moot; and Algonquin's motion to dismiss Synergics's claim for attorneys' fees is denied.

A separate Order follows, consistent with this Memorandum Opinion.


Date:   June 20, 2014                              _____/s/_____
                                                 Ellen Lipton Hollander
                                                 United States District Judge

---

[13] Based on this conclusion, and because Eagle Creek will be dismissed as a defendant, I need not address Synergics's assertion that Eagle Creek's presence in the case as a defendant provides further support for its entitlement to attorneys' fees.